UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>William J. Knowles</u>

     v.                           Civil No. 05-363-JL
                                   Opinion No. 2008 DNH 052

NH Department of Corrections,
<u>Commissioner, et al.</u>


<u>**MEMORANDUM AND ORDER**</u>


    Plaintiff William Knowles, a New Hampshire State Prison
inmate, seeks to recover damages from the N.H. Department of
Corrections (DOC) and its employees under 42 U.S.C. § 1983 for
allegedly failing to provide or arrange for medical treatment in
violation of his constitutional rights.

    "Federal courts are courts of limited jurisdiction.  They
possess only that power authorized by Constitution and statute
. . . ."  <u>United States v. Coloian</u>, 480 F.3d 47, 50 (1st Cir.
2007) (quoting <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511
U.S. 375, 377 (1994)).  This court has subject matter
jurisdiction over this case under 28 U.S.C. §§ 1331 (federal
question) and 1343 (civil rights).

    The defendants have moved for summary judgment, arguing that
the plaintiff failed to exhaust the administrative remedies
available to him as required by the Prison Litigation Reform Act,
42 U.S.C. § 1997e(a) (PLRA), and that, as a matter of law, the

plaintiff is unable to establish that the defendants acted with the requisite deliberate indifference to his medical needs.

After a hearing on the motion, for the reasons set forth below, the court finds that the plaintiff has failed to exhaust the available administrative remedies available through DOC's three-level grievance procedure, and grants summary judgment in favor of the defendants.


**Applicable legal standard**

Under Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila v. Corporación de P.R. Rico Para la Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).

When as here[1] the party moving for summary judgment also bears the burden of proof at trial, summary judgment will not be granted unless, based on the record taken in the light most favorable to the nonmoving party, no reasonable jury could find for the nonmoving party.  See E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002); Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 84 F.3d 32, 35 (1st Cir. 1996).  To defeat a motion for summary judgment, "the non-moving party must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which she would bear the ultimate burden of proof at trial."  Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (internal quotation marks omitted).  Further, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rest upon the mere allegations or denials of his pleading."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that

---

[1] As explained infra, the defendants have asserted the affirmative defense of failure-to-exhaust under 42 U.S.C. § 1997e(a).  Since they carry the burden of proving this defense at trial, see Jones v. Bock, ___ U.S. ____, 127 S. Ct. 910, 922 (2007), they carry the burden on this motion.

3

party's favor.  Rodríguez v. SmithKline Beecham, 224 F.3d 1, 5
(1st Cir. 2000)).

Failure-to-exhaust available remedies as required by the
PLRA is an affirmative defense.  The plaintiff need not plead
exhaustion in the complaint; rather, failure-to-exhaust must be
asserted by and proven by the defendant.  Jones v. Brock, 127 S.
Ct. at 922.  Having asserted the defense in their answer to the
complaint and the pending motion, the defendants carry the burden
of proving it.


**FACTS**[2]

Knowles was incarcerated at the New Hampshire State
Prison ("NHSP") from March of 1987 until October of 2003, when he
was released on parole.  In the 1990s, while imprisoned, Knowles
was diagnosed with glaucoma.  Thus, during his incarceration,
Knowles regularly underwent tests and medical checkups for the
condition.  Knowles asserts that he continued to get regular
checkups for his glaucoma on his own once he was released on
parole.

In March of 2004, Knowles violated the conditions of his
parole and was returned to the NHSP where he remains.  Between
March of 2004 and August of 2005, Knowles underwent eye

---

[2] These facts are presented in a light most favorable to the
plaintiff.  Rodriguez, 224 F.3d at 5.

examinations by Optivan, an eye care service that contracted with
the DOC to provide vision care to DOC inmates.  During these
examinations, Knowles was evaluated for glasses, the status of
his glaucoma, and for other special vision needs.

On at least three occasions, Optivan personnel notified the
NHSP medical department that Knowles needed to be sent to an
outside specialist for a "field test," a specialized procedure
for glaucoma patients to determine the nature and extent of
ocular damage.  Knowles was advised by two nurse practitioners
that he was on a list to be taken to see a specialist for a
"field test," but was never performed.

On August 31, 2005, Knowles told a nurse taking his blood
pressure that he had been experiencing slight blurriness in his
left eye for several days.  The nurse advised Knowles to report
to sick call if the problem persisted.  Two days later, Knowles
reported to sick call at 7:50 a.m. to report that the problem
with his left eye was quickly worsening.  Late that afternoon,
Knowles was taken outside of the prison to see a specialist, Dr.
Ford, who advised Knowles the damage to his left eye was
permanent.  Dr. Ford prescribed additional medication and other
follow-up measures, and directed that Knowles be seen again after
two weeks.  (As of October 11, 2005, Knowles had not been
returned to Dr. Ford's office for follow-up.  In that time,

Knowles asserts the condition of his left eye has worsened to the point where it has become almost entirely nonfunctional.)

Knowles alleges that the defendants' lack of attention to his known and serious eye condition caused it to worsen to the point where his vision has been severely and permanently damaged. He claims that although he has received some medical care, it has been inadequate to meet his serious known medical needs because he was denied prompt access to both an eye specialist and a "field test" which was a necessary tool in properly diagnosing and treating the glaucoma.[3]

In his objection to the motion for summary judgment, the plaintiff claims that he "attempted to obtain the help he needed through the administrative grievance procedure in place at the prison." The NHSP records before the court reveal that he filed a number of inmate request slips (see the explanation of NHSP's administrative grievance procedure, infra) regarding his general ocular health, need for eyeglasses, and eventually, his glaucoma. On March 5, 2004, he submitted an inmate request slip expressing his desire for an eye examination and glasses. On March 17,

---

[3] Although not directly germane to the motion at bar, an opinion letter issued by Dr. Ford at the plaintiff's request, dated August 17, 2007, opined that the "failure to perform visual field evaluation did not lead to Mr. Knowles' unfortunate outcome in his left eye." Although this document was not authenticated as required by Rule 56(e), all parties discuss it in their summary judgment filings and evidently do not question its admissibility. See Perez v. Volvo Car Corp., 247 F.3d 303 (1st Cir. 2001).

2004, he filed an inmate request slip making the same request.
On May 10, 2004, after undergoing the eye examination, he
submitted an inmate request slip asking prison personnel to
"check on my glasses as I've not received them yet . . . ."  On
March 31, 2005, he submitted an inmate request slip explaining
that "Opti-Van will be giving me a pressure-check for glaucoma in
right eye; I would also like an eye exam & new glasses.  At the
same appt if that is OK."  On October 24, 2005, he submitted an
inmate request slip stating that he had requested a "follow-up
appt with Dr. Ford re:  left eye," as well as other health
issues.  On December 15, 2005, and January 15, 2006, the
plaintiff filed inmate request slips making reference to the
claims asserted in this lawsuit.

    Each of these inmate request slips prompted written
responses from the facility administrators, but none resulted in
a field test or visit to an eye doctor.  Nowhere in his summary
judgment papers does the plaintiff claim that he appealed these
responses to the Warden, or from there, to the Commissioner of
Corrections.  The NHSP records before the court contain no
documentation of any such appeals.  The defendants have filed
three affidavits stating that no records of any appeals to the
Warden or Commissioner of Corrections are under the custody or
control of the Department of Corrections.

**ANALYSIS**

The opening provision of the PLRA sets forth its "invigorated" administrative exhaustion requirement.[4]  Because the main purpose of PLRA (itself a group of amendments to the Civil Rights of Institutionalized Persons Act (CRIPA)) is "to reduce the quantity and improve the quality of prisoner suits,"[5] the exhaustion requirement has been described by the Supreme Court as the PLRA's "centerpiece."  <u>Woodford v. Ngo</u>, 548 U.S. 81, ___, 126 S. Ct. 2378, 2382 (2006).  It provides:

> **(a) Applicability of Administrative Remedies.**
> No action shall be brought with respect to prison conditions under §1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The PLRA requires prisoners asserting a claim under 42 U.S.C. § 1983 to exhaust administrative remedies before -- literally, as a condition precedent to -- putting the claims into suit.  As the Supreme Court noted in <u>Porter</u>, "All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy and effective."  534 U.S. at 524 (internal quotation marks omitted).

---

[4]<u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002).

[5]<u>Id.</u>

Specifically, what "the PLRA exhaustion requirement requires" of prisoners is "proper exhaustion." <u>Woodford</u>, 126 S. Ct. at 2387.  The doctrine of proper exhaustion provides:  "As a general rule ... courts should not topple over administrative decisions unless the administrative body not only has erred, <u>but has erred against objection made at the time appropriate under its practice</u>."  <u>Id.</u> at 2385 (internal bracketing omitted) (quoting <u>United States v. L.A. Tucker Truck Lines</u>, 344 U.S. 33, 37 (1952)).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  <u>Id.</u> at 2386 (footnote omitted).

"[T]here is no 'futility exception' to the PLRA exhaustion requirement."  <u>Medina-Claudio v. Rodriquez-Mateo</u>, 292 F.3d 31, 35 (1st Cir. 2002).  In other words, even if the prison's administrative process does not provide for the type of relief the inmate desires, the prisoner must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief.  <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001).  Thus "a prisoner must now exhaust administrative remedies even where the relief sought -- monetary damages -- cannot be granted by the administrative process."

<u>Woodford</u>, 126 S. Ct. at 2382-2383 (citing <u>Booth</u>, 532 U.S. at 734, 121 S. Ct. at 1819).

The defendants argue that the case must be dismissed because the plaintiff has not exhausted his available administrative remedies.  The DOC has promulgated administrative remedies in the form of a formal grievance procedure for dealing with inmates' complaints.  The grievance procedure is set forth in DOC Policy and Procedure Directive (PPD) 1.16, which the defendants have attached as an exhibit to their motion for summary judgment.  The procedure is also set forth in the New Hampshire State Prison Inmate Manual.  The parties agree that all inmates receive the Inmate Manual upon admission to the facility, and that the manual is readily available to them.

PPD 1.16's three-level process was thoroughly but succinctly described by this court in <u>LaFauci v. New Hampshire Department of Corrections</u>, 2001 DNH 204, 2001 WL 1570932 (McAuliffe, J.):

>At the lowest level of the administrative process, inmates are instructed to resolve their complaints orally if possible.  If that proves unsuccessful, they may file a written complaint or request for information, known as an "inmate request slip."  Typically, both oral and written requests and/or complaints must follow the "chain of command." Accordingly, inmates are instructed to address their requests to the correctional officer of lowest rank whom they believe can resolve the issue.
>
>When an inmate request slip is received, one of three outcomes will follow: (1) the prison staff member who is allegedly the source of

the problem or who possesses information the
inmates seek will respond to the inmate
directly; or (2) that staff member's
supervisor will investigate the matter; or
(3) a formal investigation will be initiated.
In the majority of cases involving
allegations of inappropriate conduct by
correctional officers (e.g., unprofessional
or demeaning language), a written request or
complaint is sent to the staff member's
supervisor.  The person who is the subject of
the complaint is interviewed, as are other
staff members and any inmates who might have
witnessed the complained-of conduct.  A brief
summary of the investigation is then
presented to the Warden.  In circumstances
involving more serious charges-claims of
excessive force, for example-the
investigation takes on greater formality, and
more witnesses may be interviewed.  Again,
the results of the investigation are
presented to the Warden.

When an investigation is complete, the inmate
receives a written response to his request.
Any discipline that is imposed on
correctional facility staff (e.g., oral
reprimand, written reprimand, order to
undergo counseling, discharge, etc.) is,
however, kept confidential.  Of course, if a
staff member is transferred or terminated,
his or her absence would likely be noticed by
the complaining inmate, who might reasonably
infer that the staff member had been
disciplined.

An inmate who is not satisfied with a
response to his or her request slip may
pursue further administrative remedies and
appeal to the Warden, by submitting an inmate
"grievance form."  Under the administrative
scheme, the Warden is afforded 15 days within
which to answer the inmate's grievance with
either an interim or final response.  If the
inmate is dissatisfied with the Warden's
response, he or she may appeal the matter to
the Commissioner of Corrections.  The
Commissioner is allowed 30 days within which

11

> to provide an interim or final response.  The
> ultimate decision of the Commissioner is
> final.  At that point, the inmate has fully
> exhausted his or her administrative remedies.

Id. at 7-10 (citing, inter alia, PPD 1.16) (internal citations
and footnote omitted).[6]

The defendants point out that the plaintiff arguably took
the first step in the grievance process by submitting several
inmate request slips, but never took the required second step of
submitting an inmate grievance form to the Warden, much less the
third of appealing to the Commissioner of Corrections.  As a
result, they argue, the case must be dismissed under the PLRA's
exhaustion requirement.

The plaintiff counters that it was impossible for him to
exhaust his remedies because there was no valid administrative
remedy or other grievance procedure in effect at the time he was
experiencing his eye problems and submitting inmate request slips
about them.  He acknowledges that the three-step grievance

---

[6] "There is an exception to the 'chain of command' rule when
the inmate believes that he or she is subject to imminent injury
or harm.  Under those circumstances, the inmate may directly
address the Warden or the Commissioner of Corrections, even if
the inmate has not previously filed an inmate request slip.  See
[PPD 1.16] Inmate Manual, section D(3).  In the days and weeks
following the events at issue in this case, LaFauci never sought
to avail himself of that exception.  And, because he is no longer
incarcerated at the NHSP, he cannot be subject to imminent harm
or injury at the hands of any NHSP inmate or employee and,
therefore, the exception plainly does not apply."  Lafauci, 2001
D.N.H. at 8 n.1.

procedure set forth above (PPD 1.16) had been promulgated at the time.  But relying on the New Hampshire Supreme Court's decision in <u>Gosselin v. New Hampshire Department of Corrections</u>,[7] he argues that the grievance procedure had not been duly adopted under the requirements of New Hampshire's Administrative Procedure Act ("APA"), N.H. Rev. Stat. Ann. 541-A, and therefore was invalid.[8]  In effect, the plaintiff argues that although the three-level grievance procedure at PPD 1.16 existed at the relevant time in this case, it was not an "administrative remedy . . . available" to him because, he believes, New Hampshire's APA and the <u>Gosselin</u> decision rendered it invalid.  In his words, "in the instant case, there were no legally enforceable administrative remedies available . . . ."

The PLRA specifically provides that a state's "failure ... to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under" CRIPA.  42 U.S.C. § 1997e(b).  This provision, which bars prisoners from claiming that a state's lack of failure to follow an established grievance

---

[7] 153 N.H. 696 (2006).

[8] In 2007, the New Hampshire Legislature enacted a statutory scheme which exempted certain of the DOC's practices and procedures from the procedural requirements of the APA.  The parties take different positions as to the applicability of the <u>Gosselin</u> decision to PPD 1.16's three-level grievance procedure as well as the relevance, retroactivity and ultimate effect of this statutory fix.  As explained <u>supra</u>, the court need not address these issues to decide the motion for summary judgment.

procedure itself constitutes a violation of their constitutional rights, answers a different question than the one raised by the plaintiff.  The plaintiff does not claim that DOC's purported lack of compliance with the New Hampshire APA in adopting PPD 1.16 violated his rights.  He argues, rather, that this alleged failure to comply rendered PPD 1.16's three-level grievance process "unavailable" to him under the PLRA.

**A.  Availability**

When interpreting a statute, the court looks first and foremost to its text, United States v. Alvarez-Sanchez, 511 U.S. 350, 356 (1994), because the court assumes "that the legislative purpose is expressed by the ordinary meaning of the words used." American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (quoting Richards v. United States, 369 U.S. 1, 9 (1962)).  Thus, "'absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'"  Id. (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)) (bracketing omitted). This focus on ordinary and natural definitions is required where, as here, a word or phrase to be interpreted is not defined in the statute in question.  Alvarez-Sanchez, 511 U.S. at 357.

"Available" means accessible or capable of being possessed or used.  In this context, it does not involve concepts of

14

procedural or technical validity.  Webster's defines "available"
as "having sufficient power or force to achieve an end," as well
as "capable of use for the accomplishment of a purpose,"
"immediately utilizable," and "that is accessible or may be
obtained:  personally obtainable."  <u>Webster's Third New
International Dictionary</u> 150 (1993).[9]  The 1990 edition of
Black's Law Dictionary defines "available" as "[s]uitable;
usable; accessible; obtainable; present or ready for immediate
use."  <u>Black's Law Dictionary</u> 134 (6th ed. 1990).[10]  <u>See</u> <u>Smith v.
United States</u>, 508 U.S. 223, 228-29 (1993) (citing Webster's and
Black's to ascertain ordinary or natural meaning); <u>Alvarez-
Sanchez</u>, 511 U.S. at 357-58 (same, American Heritage Dictionary).

    There is no question that the three-level grievance
procedure set forth in the Inmate Manual and promulgated by the
DOC at PPD 1.16 was literally "available" to the plaintiff.  He
makes no claim that it was not, and describes his own use of its
first level.  Questions as to whether the DOC's adoption of PPD

---

    [9] Section 1997e(a) was enacted in 1994.  Citations to
dictionaries in this opinion are to editions published at the
time of the enactment of the PLRA.

    [10] It is true that the definitions of "available" in these
references also include the adjective "valid" in the legal
context, but those definitions refer to the validity of a legal
plea or charge in the sense of an allegation or assertion, as
opposed to the meaning argued by the plaintiff:  the
"foundational" or derivative validity of an article of positive
law, such as a statute, rule, or regulation, derived from its
foundation in, its enactment's or compliance with, enabling
legislation.

1.16 complied, or was required to comply, with the provisions of New Hampshire's APA have no bearing on either it was "unavailable" to the plaintiff or any other inmate.

As the heavy docket of prisoner litigation in this court makes readily apparent, inmates have managed to exhaust the administrative remedies set forth in the three-level procedure since its implementation in 2002.  It is set forth in the Inmate Manual distributed to each inmate upon admission to the prison. It gives inmates the opportunity to lodge complaints in a manner which provides notice to the prison administration.  PPD 1.16(IV)(A).  It provides for an administrative response to the inmate's complaint and requires that such responses be in writing.  PPD 1.16(IV)(A)(3),(5).  The first step is also waivable where an inmate can demonstrate that using the process "is likely to result in an identifiable risk of harm to their physical safety or psychological well-being."  See supra n.6; Lafauci, 2001 D.N.H. at 8 n.1.  The procedure allows an appeal to the prison warden on an "Inmate Grievance Form" if the inmate is not satisfied with the initial response to his complaint (PPD 1.16(IV)(B)), and from there, an appeal to the Commissioner of Corrections, who must provide an interim or final response within 30 days.  PPD 1.16(IV)(C).  The grievance procedure, while simple and immediately accessible to prisoners, is highly formalized and standardized, with specific time frames and mandatory

standardized forms.  PPD 1.16(III)(D), (E) and (F).  As explained
<u>supra</u>, use of these forms and observance of these deadlines is
required for "proper exhaustion."  <u>Woodford</u>, 126 S. Ct. at 2386.

**B.   Administrative Remedy**

Since the three-level grievance procedure was undoubtedly
available to the plaintiff in both the literal and legal senses,
the question remains whether, despite never having been adopted
in the manner set forth under New Hampshire's APA, PPD 1.16 is in
fact an "administrative remedy" as required by § 1997e(a).
Because Congress did not define the term "administrative remedy"
in § 1997e(a), this court gives those words their ordinary
meaning.  <u>See</u> <u>Asgrow Seed Co. v. Winterboer</u>, 513 U.S. 179, 187
(1995) (citing <u>FDIC v. Meyer</u>, 510 U.S. 471, 476 (1994)).  Black's
Law Dictionary defines "administrative remedy" to be "'a
nonjudicial remedy provided by an administrative agency.'"
<u>Black's Law Dictionary</u> 1296 (7th ed. 1999).  PPD 1.16 fits the
bill.  It was promulgated by the DOC, undoubtedly a state
administrative agency.  Utilized and enforced by this agency
since 2002, it is formally entitled "New Hampshire Department of
Correction Policy and Procedure 1.16."

Another source defines "administrative" as "proceeding from
. . . an administration," which, in turn, is defined as "a body
of persons who are responsible for managing a business or an

17

institution." <u>Webster Third New International Dictionary</u> 28
(1993).  In this case, PPD 1.16, printed in the Inmate Manual,
"proceeded from" the DOC through the prison Warden and his staff,
who, as a group responsible for managing the prison, comfortably
fit within the above-quoted definition of "administration."

Although this question -- whether the three-level grievance
procedure was available to the plaintiff despite the fact that it
was not promulgated in accordance with allegedly applicable
enabling legislation (like New Hampshire's APA) -- is an issue of
first impression in this court and circuit, the Third Circuit
addressed the issue squarely in <u>Concepcion v. Morton</u>, 306 F.3d
1347 (3rd Cir. 2002).  The issue there, as here, was "whether the
PLRA's exhaustion requirement applies to a grievance procedure
described in an inmate handbook but not formally adopted by a
state administrative agency."  <u>Id.</u> at 1348-49.  The court held
"that a remedy need not be formally adopted through regulations
by an agency in order for it to be considered an 'administrative
remedy' within the scope of § 1997e(a)'s exhaustion requirement."
306 F.3d at 1355.  The plaintiff has not cited, either in his
summary judgment papers or at the motion hearing, any authority
to the contrary.

The Fifth Circuit reached a similar conclusion in a case
cited by the defendants, <u>Ferrington v. Louisiana Department of
Corrections</u>, 315 F.3d 529 (5th Cir. 2002).  There, the plaintiff

18

argued that since the Louisiana Supreme Court held the state's prisoner grievance system to be unconstitutional,[11] the grievance system was thus "unavailable" to him as an administrative remedy under the PLRA.  The Court of Appeals disagreed and affirmed the district court's dismissal on failure-to-exhaust grounds. Specifically, the court held that the invalidity of the grievance system under state law "has no impact on the necessity of exhaustion prior to the filing of a § 1983 claim in federal court.  As long as a prison administrative grievance system remains in force . . . ., [the prisoner] must exhaust.  Exhaustion remains mandatory, 'irrespective of the forms of relief sought and offered through administrative remedies.'"  Ferrington, 315 F.3d at 532 (quoting Booth, 532 U.S. at 741 n.6).

Nowhere in § 1997e did Congress indicate that the manner in which a remedy is enacted, adopted, or otherwise promulgated affects the applicability of the statute's exhaustion requirement.  The court is unaware of -- and the plaintiff has not presented any evidence of -- an instance in which New Hampshire state prison officials have refused to entertain an inmate request slip, grievance form addressed to the warden or appeal to the Commissioner of Corrections on the ground that its

---

[11] Pope v. Louisiana, 792 So. 2d 713 (La. 2001) (holding Louisiana's prison grievance system unconstitutional to the extent that it purported to deprive Louisiana state courts of original jurisdiction over prisoner cases).

own three-step procedure under PPD 1.16 had not been duly enacted
under New Hampshire's APA.  If it had, the result here might be
different because it could not be said that an administrative
remedy procedure considered invalid by the prison administration
itself was an "administrative remed[y]... available" to inmates.
See 42 U.S.C. § 1997e(a).  In that instance, the plaintiff's
argument that the doctrine of estoppel should prohibit the
defendants from raising failure-to-exhaust as an affirmative
defense might warrant further consideration.  See generally,
Beltran v. O'Mara, 405 F.Supp.2d 140, 153-54 (D.N.H. 2005)
(reasoning that prison officials can make remedy "unavailable"
under PLRA by preventing inmate from using it).  That is simply
not the case here.

     The plaintiff does not argue, or present evidence to
contradict, the defendants' sworn assertions that he never
appealed from or otherwise progressed beyond level one of the
three-level grievance procedure, either within the time limits
imposed by PPD 1.16 or at any other time.  Nor does the plaintiff
claim that he had not received notice of the three-level
grievance procedure, or was otherwise unaware of it in a way that
might arguably have made it unavailable to him.

**CONCLUSION**

Even accepting as true the facts asserted in the plaintiff's summary judgment opposition papers, and viewing the facts in a light most favorable to the plaintiff, the court discerns no evidence to suggest that the plaintiff exhausted his administrative remedies with regard to the issues involved in this litigation.  See Celotex, 477 U.S. at 323; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986).  The defendants' motion for summary judgment (Document no. 37) on his failure-to-exhaust affirmative defense is therefore granted.  The plaintiff's claim is dismissed without prejudice for his failure to exhaust administrative remedies.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Date:  March 11, 2008

cc:  Nancy Sue Tierney, Esq.
     Anthony I. Blenkinsop, Esq.